## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| **RONALD SMITH,** | | |
| **Plaintiff.** | | |
| | | |
| **v.** | **No. 5:23-cv-00623-JKP-HJB** |
| | | |
| **BEXAR COUNTY, TEXAS,** | | |
| **BEXAR COUNTY SHERIFF'S DEPUTY** | | |
| **RAMIRO SANCHEZ,** | | |
| **Defendants.** | | |

# PLAINTIFF'S 1st AMENDED ORIGINAL COMPLAINT

**I.**                                  **CASE SYNOPSIS**

This is a case based upon violations of Plaintiff's Constitutional rights by these Bexar

County Defendants on April 14, 2021. These 42 U.S.C. 1983 suits may be brought in both

federal and state courts, *Howlett v. Rose,* 496 U.S. 356 (1990). Among other things, Plaintiff

brings claims under the 4th Amendment for unlawful arrest, unlawful search, and unlawful

mental health detention. Further, Plaintiff brings claims against Bexar County, Texas

under *Monell v. New York City Dept. of Soc. Svcs.,* 436 U.S. 658 (1978). Additionally, Defendant

Sanchez violated federal statues regarding the unlawful discrimination against individuals with

disabilities. These acts were committed by Texas Peace Officers acting under the color of state

law, and according to policies of Bexar County, Texas. Plaintiff seeks Attorney fees under 42

U.S.C. 1988. This case was filed as 2023CI07389 in the 37th Bexar County District Court on

April 14, 2023. This case was removed to federal court by the Defendants on May 15, 2023.

## II.                               PARTIES

a.   RONALD SMITH is a resident of Comal County, Texas, and works throughout Texas. For the sake of brevity, Plaintiff will be referred to as 'SMITH.'

b.   BEXAR COUNTY, TEXAS is a government subdivision in Texas. Bexar County, Texas has its administrative offices in San Antonio, Texas. Bexar County, Texas has a law enforcement arm in the Bexar County Sheriff's Office. For the sake of brevity, Defendant will be referred to as 'COUNTY.' COUNTY is an artificial person.

c.   RAMIRO SANCHEZ is a Bexar County Sheriff's Deputy. SANCHEZ was a Deputy on April 14, 2021, riding traffic patrol. For the sake of brevity, this Defendant will be referred to as 'SANCHEZ.' At all relevant times, SANCHEZ was acting as a licensed Texas Peace Officer. SANCHEZ is sued in his **individual capacity only.**

## III.              SUBJECT MATTER JURISDICTION

This Honorable Court has subject matter pursuant to 28 U.S.C. 1331, the United States Constitution, 42 U.S.C. 1983, 42 U.S.C. 1988, the Americans with Disabilities Act of 1990; 42 U.S.C. 12101 and the Rehabilitation Act of 1973; 29 U.S.C. 791 et seq.

## IV.              VENUE AND PERSONAL JURISDICTION

Venue is proper pursuant to the Federal Rules of Civil Procedure 28 U.S.C. 1391(b)(1)(2) because all of the relevant events occurred in Bexar County, Texas and all of the Defendants work in or reside in Bexar County, Texas.

## V.                  SERVICE OF PROCESS

a.   BEXAR COUNTY, TEXAS has been served process through Bexar County Judge
Peter Sakai 101 East Nueva, 10th Floor, San Antonio, TX 78205, on April 19, 2023.


b.   RAMIRO SANCHEZ has been served process at the Bexar County Sheriff's Office
North substation at 15903 University Oak, San Antonio TX 78249, on April 20, 2023.


## VI.              ENCAPSULATION OF CLAIMS

**a.**  Plaintiff seeks compensation for an unlawful arrest, unlawful search, unlawful seizure and
intrusive procedures in an unlawful medical detention on April 14, 2021. The Plaintiff
experienced this dubious and retaliatory medical detention, after the Deputies' inquiries
discovered no criminal conduct. Defendants SANCHEZ and COUNTY are responsible for the
unlawful arrest and unlawful medical detention respectively. Both acted according to
COUNTY policies in following arrest policies, and inattention to civil rights. Most unsettling,
were Defendant SANCHEZ' persecution and discrimination of SMITH because of his Dyslexic
condition.

**b.**   Plaintiff SMITH endured emotional trauma as a result of being handcuffed, seized, strapped
to a gurney and transported to the Hospital as a "loony." Plaintiff SMITH endured the invasive
nature of an unlawful contact, unlawful detention, unlawful arrest, and unlawful search. SMITH
was physically seized and transported against his will without just cause or a lawful basis.
Further, there was no medical necessity or emergency. SMITH was disenfranchised and
estranged because of his Dyslexia.


## VII.             FACTUAL ALLEGATIONS

**(1)** RONALD SMITH is a resident of Bulverde, Texas. SMITH is a truck driver by profession.
This requires that he keep a clear and clean driving record in his personal and professional life.
Otherwise, he will be denied employment. SMITH is also concerned about the United States, and

the world in which he lives. SMITH is a First Amendment proponent, and a critic of most government entities. In the wake of the George Floyd tragedy, SMITH has taken a closer look at the actions of those who wield power.

(2)  On April 14, 2021, SMITH was traveling North on Bulverde Road in Bulverde, Texas. SMITH just had lunch with his wife, Natalie, near Kirby, Texas. The lunch was pleasant, and there was nothing out of the ordinary. SMITH was returning from the Kirby area to his home in Bulverde, Texas. The time was approximately 1:15 PM. SMITH was not far from his home, when he stopped his vehicle near a residential area.  SMITH had been moving safely with the flow of traffic. SMITH was in a calm frame of mind. SMITH was not distressed or angered, nor did he possess anxieties. SMITH had no thoughts of harming himself, or anyone else. Rather, SMITH merely desired to return to his house in Bulverde. But, SMITH believed he may have incurred a flat tire.

(3)  Approximately 1 minute later (60 seconds), Deputy SANCHEZ arrived on a motorcycle unit. SMITH inquired about SANCHEZ' purpose. Immediately, SANCHEZ demanded information and identification without specifying the basis of his arrival. SANCHEZ was not dispatched to the location, nor on a service call. At some point, SANCHEZ meandered to the topic of motor vehicle conduct. SANCHEZ was on duty, in uniform, and acted under the color of law as a licensed Texas Peace Officer. The contact was not consensual. SMITH expressed his displeasure at SANCHEZ' arrival. SMITH was attending to an ailing vehicle, and SANCHEZ never announced the basis for his presence. However, SMITH was not free to leave, as SANCHEZ demanded personal information from SMITH, such as his name, his date of birth, his Driver's License Number, etc. Likewise, SMITH wasn't able to just ignore SANCHEZ.

(4)  At every turn, SANCHEZ controverted himself. SANCHEZ stated he was moving Southbound on Bulverde Road, while SMITH was traveling Northbound. Thus, SANCHEZ and SMITH never were in direct contact with one another. That section of the road is multi-laned and quite busy. Then, SANCHEZ stated he either did not have a radar gun, or that it was not working

or deployed. SANCHEZ also admitted he "lost contact" with the vehicle he was seeking. SANCHEZ stated he lost direct sight of the vehicle he sought. SMITH was not angry, nor aggressive with SANCHEZ. SMITH was merely perplexed at SANCHEZ' presence, and SANCHEZ' inability to pronounce the purpose of this detention. SMITH desired to attend to his vehicle's tire, so he could resume his trip. Likewise, SMITH was dumbfounded by SANCHEZ' inexpert and rambling questions. SMITH had no guns, no weapons, and no drugs on his person, in his possession, or in his vehicle.

**(5)**  So, at every turn, SANCHEZ is trying to allude to alleged traffic violations. But, SANCHEZ refuted his own position. SANCHEZ did this by admitting the vehicle he sought and he were never in direct contact…going opposite directions on Bulverde Road. SANCHEZ conceded he did not have radar deployed while he was moving. Thus, any observations he made would not be based on scientific principles. Further, SANCHEZ admits he lost contact with his "grey or black" sedan. In essence, SANCHEZ chanced upon a stationary SMITH, who possessed a common color and make of sedan. SANCHEZ arrived approximately 60 seconds after SMITH had stopped his vehicle to assess for a flat tire. SMITH and SANCHEZ never had any motor vehicle interactions or exchanges prior to SANCHEZ' arrival.

**(6)**  SANCHEZ asked all manner of inane, personal, and unrelated questions to law enforcement matters. At one point, SANCHEZ requested personal biographical information from SMITH. SMITH remarked that he had been professionally diagnosed with **<u>Dyslexia</u>** since age 6. Further, this Dyslexic condition hindered and prevented him from remembering data, information, and numerical sequences. Immediately, SANCHEZ changed his demeanor when hearing about this learning disability. SANCHEZ became more agitated and irate. SANCHEZ seemed to jest about SMITH's condition, and treated him differently than before. SANCHEZ now formulated a desire to cause SMITH some grief from what he perceived as a "lack of cooperation." SANCHEZ aimed to arrest SMITH for his inability to provide information. Regardless of the origins of SMITH's inability to vocalize and recall factual information, SANCHEZ sought to retaliate with a coerced seizure. Rather than make reasonable accommodations for SMITH's disability, such

as running SMITH's license plate or letting SMITH retrieve his I.D., SANCHEZ wanted to initiate a full-blown arrest.

**(7)**   As SANCHEZ made no headway with his traffic inquiry, he became frustrated because SMITH was growing impatient with this pointless encounter. At this point, Deputy ESPINO arrived. Now, SANCHEZ became emboldened. SANCHEZ immediately spun SMITH around and handcuffed him upon ESPINO's arrival. SMITH was placed in the back of ESPINO's cruiser. The problem was this: SMITH had not committed any type of criminal or traffic violation. No traffic citations ever issued to SMITH. No criminal charges ever issued to SMITH. SANCHEZ did not articulate any description of criminal conduct to SMITH. SANCHEZ never stated directly or indirectly to SMITH that he had committed a criminal act or a traffic violation. SMITH was puzzled, but was not confrontational with the Deputies. SMITH merely wanted to know what justified the law enforcement presence, and why his liberty was constrained.

**(8)**   In handcuffing SMITH, SANCHEZ forced and shoved SMITH downward. SANCHEZ forcefully twisted and contorted SMITH's arms behind his back, while clicking and securing the handcuffs to an excruciating degree of tightness. This extreme tautness caused the shackles to cut into SMITH's tissue and nerves. The handcuffs cut into SMITH's wrists, causing pain, discomfort, and visible exterior trauma. SMITH had persistent symptoms after this incident, with continued pain, discomfort, swelling, cuts, and reduced mobility of his wrist joints. SANCHEZ rummaged SMITH's pockets, then seized his possessions, and his car keys.

**(9)**   Now, SANCHEZ started rummaging the contents in SMITH's vehicle. SANCHEZ looked in the car, entered into the car, and took out personal property from the car. SMITH had ordinary toothpaste in his console. SANCHEZ placed the toothpaste on the hood of SMITH's car and performed some type of chemical test. Evidently, SANCHEZ was "testing" the contents of items in SMITH's car. Ostensibly, SANCHEZ was searching for drugs or contraband. SANCHEZ found no such items.

**(10)**   SANCHEZ had a quandary on his hands. He had physically detained, seized, and arrested SMITH without an underlying criminal or traffic violation. SANCHEZ could cite no traffic offense or a criminal offense to justify an arrest. At that point, it would have been retroactive. SANCHEZ could detect no contraband, drugs, or illicit items in SMITH's vehicle either.

**(11)**   At this point, the process is becoming extended and prolonged. SMITH was already arrested. Now, SANCHEZ and ESPINO start discussing the situation. The two Deputies were faced with the reality of an ill-advised and unlawful arrest and search. So, SANCHEZ and ESPINO turned tack. They asserted SMITH was "having a mental or emotional crisis." SANCHEZ summoned an ambulance.

**(12)**   The event is taking so long that SMITH's wife, Natalie, is called and has time to make the 45 minute transit from her workplace. ESPINO talks with Natalie Smith, and is informed SMITH has no underlying conditions or pathologies. By this time, the encounter has lasted well over an hour. In fact, it took about **2 hours** from the time SANCHEZ contacted SMITH until the Ambulance forcefully transported SMITH to University Hospital. Thus, SMITH, SANCHEZ, and several other Deputies were on site where SMITH's hobbled vehicle rested for 2 hours.

**(13)**   SANCHEZ talked to the newly arrived ambulance personnel. The Acadian ambulance personnel, the E.M.T.s, discovered no anger, anxiety, depression, or disturbed emotional state in SMITH. The E.M.T.s stated nothing was wrong with SMITH based upon their professional training. In fact, the E.M.T.s called University Hospital for guidance. University Hospital did not want them to transport SMITH, based upon its knowledge Bexar County, Texas has a penchant for ordering bogus "mental health detentions" and because SMITH showed no outward signs of a mental crisis. University Hospital told the Acadian E.M.Ts. not to transport SMITH.

**(14)**   Part of Bexar County's motivation in initiating mental health detentions is the financial aspect for Deputies. Bexar County Sheriff's Deputies receive overtime pay for accompanying the detained person to the Hospital, and for completing the sundry Incident Reports. In fact, Deputy

7

ESPINO remarked to SANCHEZ, "I'm going to get overtime for this."

**(15)**   Undaunted by the Hospital's and the E.M.T.s' aversions to transporting SMITH for mental detention, SANCHEZ ordered and directed the E.M.T.s to take possession of SMITH. SMITH is retrieved from the back of the cruiser, and strapped onto a gurney over his protestations. SMITH is loaded into the ambulance, and ESPINO climbs in. The Deputies' encounter with SMITH lasted approximately 2 hours.

**(16)**   The ambulance arrived at University Hospital across San Antonio, later in the afternoon. Almost immediately, Hospital staff assess SMITH as cogent, lucid, and calm. Doctors cannot detect any mental or emotional crisis, or any such distress. SMITH is discharged within an hour upon arrival, and under his own care. There was no criminal basis for an arrest or seizure. There was no emotional or psychological crisis. This is evidenced by SMITH's summary discharge.

**(17)**   SMITH was physically detained, seized, handcuffed, and arrested by Deputy SANCHEZ. No criminal charge or traffic citation issued from SANCHEZ. SANCHEZ rummaged through SMITH's automobile and personal effects, in the hopes of detecting contraband. No such illicit items existed. When faced with the reality there was no underlying criminal conduct, the Deputies implemented Bexar County policies directing and compounding 4th Amendment violations. The aim was to generate additional income through overtime pay. Additional pay is obtained by accompanying prisoners to Jail, to the Hospital, and in transport. A byproduct was to try and justify the illegal seizure of SMITH.

**(18)**   SMITH was harmed by an unlawful intrusion on his person, his property, and his liberty. SMITH was accosted and arrested without any underlying criminal violation. At the scene, E.M.T. personnel detected no mental, emotional, or health crisis and did not wish to take custody of SMITH. SANCHEZ ordered SMITH's transport to University Hospital, where he was summarily released. Along the way, SMITH was tussled, poked, and prodded. On that day, April 14, 2021, SMITH had personal matters to attend to. This was interrupted by his summary

arrest. Furthermore, SMITH was sent a $2400 Ambulance bill for the transit to University Hospital. In so far as it was considered, SMITH vigorously protested to his arrest, his detention, and any transportation to the Hospital.

(19)   The bizarre nature of this incident left SMITH stunned and indignant. At various times, SMITH sought information from COUNTY about this matter. SMITH felt he had a right to be informed and receive some documentation. To that end, SMITH hired Counsel to make inquiries. Counsel became aware body camera videos of the event existed. Under Texas law, the public has a right of access to government information. This is codified in the Texas Public Information Act. A formal request was proffered to COUNTY on March 3, 2023 for all related video images of the event from RAMIRO SANCHEZ (S005800-030323), and Deputy Espino. This Texas PIA request was sent to COUNTY **42 days prior to the filing of this suit.**  Bexar County, Texas did not willfully provide the information, did not offer any objections, nor provide reasons why the videos could not be produced. Counsel lodged a Texas Attorney General complaint designated (OR-23-000271-IC) on April 12, 2023. This was sent to Bexar County, Texas, see Att. B. COUNTY refused to produce videos which show the initial encounter between SMITH and SANCHEZ, the arrest, the search, or visible signs of emotional distress. So, with approximately 6 Deputies on site—the Bexar County Sheriff's Office did not produce SANCHEZ' initial encounter with SMITH, nor his *Terry* stop, the arrest and handcuffing, the search of SMITH's vehicle, or any trace of mental distress. Counsel believes it is a deliberate policy of evidence spoilage, usually law enforcement evidence, based upon past experiences with COUNTY.

(20)   This "failure" of production is not a product of happenstance. Rather, COUNTY has an informal custom or practice of obstructionist tactics. When a citizen desires information which casts COUNTY personnel in unlawful or tortious conduct, COUNTY refuses to produce these materials. The ultimate desire is to forestall and preclude COUNTY liability through lawsuits, litigation, or media introspection. Thus, the failure to produce otherwise public information is by deliberate design to obstruct lawsuits against COUNTY. The intent is to limit and eliminate

potential evidence. Ultimately, the effect is to deprive citizens of their 1st Amendment rights of access to the Courts, and their 1st Amendment Right to Petition.

**(21)** Bexar County, Texas has the Bexar County Sheriff's Office as its law enforcement arm. The Final Policymaker for Bexar County's law enforcement is the Sheriff, Sheriff Javier Salazar. Sheriff Salazar has an active role in formulating COUNTY policies.

**(22)**   One of the driving forces in COUNTY's policies is the Selective Traffic Enforcement Program (STEP). This policy generates money for COUNTY through monetarily incentivized arrests. The program is a concerted effort between the National Highway Traffic Safety Administration (NHTSA) and the Texas Department of Transportation (TxDOT). The results are federal grants which flow from the United States to State agencies. Ultimately, law enforcement departments and municipalities receive these funds. COUNTY has been a participant in the STEP program for many years. This STEP Program requires efforts by COUNTY Policymakers to fill out the detailed paperwork and yearly applications. COUNTY Policymakers must compile schedules and designate areas of patrol, Att. A '2021 TxDOT Texas STEP Grants,' pp. 14, 17.

**(23)** Primarily, the STEP Program focuses on D.W.I. offenses. However, the STEP Program also has many other listed offenses which fulfill its criteria. For example, reckless driving and a failure to wear a seat belt are also triggering catalysts. Road rage and aggressive driving are also included. Essentially, a laundry list of traffic related offenses invoke the STEP program and its incentivized arrests. Thus, Bexar County Sheriff Deputies generate more pay for themselves and funds for the COUNTY by effecting more arrests from traffic encounters. It makes no difference whether the criminal charges fail to result in a conviction. Rather, the statistics of arrest provide the source of income. The more arrests generated, the more lucrative it is for COUNTY, Att. A '2021 TxDOT Texas STEP Grants,' pp. 9, 11. Deputies who implement the STEP arrest policy receive pay raises and advancements, Att. A '2021 TxDOT Texas STEP Grants,' p. 17. COUNTY keeps statistics on the STEP arrests, and it monitors these statistics, posting and boasting of arrests on its Facebook social media page.

**(24)**  The problem with this STEP Program is it encourages monetarily incentivized arrests and detentions. The more of these which are generated, the larger the grant award COUNTY receives, See Att. A '2021 Texas STEP Grants,' p. 22, $400,000 to COUNTY in the year 2021. It inspires and even directs COUNTY Deputies to initiate baseless traffic stops, and heighten them to unlawful arrests and detentions. SANCHEZ commenced his initial contact with SMITH without any reasonable suspicion or probable cause of criminality. SANCHEZ then invoked the STEP policy of incentivized seizures. Once SANCHEZ realized he couldn't even retroactively come up with some criminal or traffic infraction, he concocted a false "mental health" crisis to justify the seizure. STEP has hourly quotas for contacts and arrests, which must be met, Att. A '2021 TxDOT Texas STEP Grants,' pp. 9, 11, 17.

**(25)**  COUNTY fails to properly train its Deputies on 4th Amendment seizure principles. These include proper instruction on "Reasonable Suspicion," and "Probable Cause." Deputies are not taught proper *Terry v. Ohio,* 392 U.S.1 (1968) principles. This means, instruction that a detention requires articulable facts which depict a reasonable suspicion criminal activity exists. In practice, COUNTY Deputies are taught subsequent discoveries retroactively provide the lawful basis for contact. Even beyond that, COUNTY Deputies are instructed subsequent discoveries retroactively provide the probable cause to arrest. Thus, suspects can be detained and even arrested based upon incomplete or inadequate information. SMITH was arrested based upon this faulty instruction. SANCHEZ tried to justify the initial *Terry* stop and ultimate arrest based upon a false and subsequent detection of a "mental health" crisis.

**(26)**  COUNTY fails to properly train its Deputies on 4th Amendment *Terry* stop principles. Deputies are not taught a lawful contact is a requisite of a lawful detention or seizure. Further, that an articulable and objective suspicion of criminality is necessary. 'Hunches' and 'gut feelings' are not adequate to detain citizens. Deputies are not taught the two principles are intertwined. In practice, Deputies utilize illegal searches to retroactively provide a basis to arrest,

and justify the initial encounter. Deputies are not instructed that unlawful searches are improper and unduly intrusive. Deputies are not taught that subsequent discoveries cannot provide a probable cause to arrest.

**(27)**   COUNTY fails to properly supervise its Deputies. Deputies are allowed and even encouraged to initiate baseless contacts with citizens. Meaning, contacts lacking a "reasonable suspicion" of criminal activity under *Terry*. Patrol Deputies are inspired to generate arrests. The underlying offenses or reasons are immaterial. Deputies are permitted to conduct unlawful seizures, searches, and arrests without reproach. The primary method for these 4th Amendment intrusions are traffic stops. COUNTY Deputies utilize traffic encounters as a conduit to rummage for drugs, contraband, firearms, and wanted persons. However, the basis of these traffic encounters are fictional traffic violations. Often, the end results of these traffic encounters are baseless criminal charges terminating in dismissals, or unlawful seizures, searches, and detentions without underlying criminal activity.

**(28)**   COUNTY has a policy of utilizing "mental health detentions" as a failsafe measure to try and justify unlawful seizures, detentions, and arrests. When a citizen is already under arrest, Deputies face a legal quandary if no lawful basis existed for the arrest. In these situations, COUNTY has a policy, practice, or custom of categorizing the detention as a "mental health" crisis under the caretaking function of law enforcement. It serves 2 purposes. First, it distracts from the illegality of the initial seizure. Second, it generates extra pay for Deputies who must accompany the prisoner/detainee to the hospital. This practice is well known to local Hospitals in San Antonio, who receive these persons. More frequently than not, University Hospital staff summarily discharge them upon arrival. It should be noted, "mental health" issues are not the basis of the initial contact, seizure, detention, or arrest of the citizen. Rather, these phantom mental and emotional issues are proffered after no criminal conduct is discovered.

**(29)**   COUNTY fails to discipline its Deputies. Deputies are permitted and encouraged to violate the 4th Amendment. This is achieved through pretextual contacts. Contacts which have no legal justification or predicate criminality. Some of these acts are the target of incentivized arrest quotas. Others are acts of self-aggrandizement in the attempts to discover criminality, rather than react to criminality. COUNTY breeds a culture where Deputies advance by aggressively seeking out criminality. Banal situations are given a criminal spin by Deputies, in the hopes of discovering contraband, drugs, weapons, or warrants. Illegal arrests purport to be remedied by subsequent discoveries, or the failsafe "mental health" crisis. Final Policymaker, Sheriff Javier Salazar, encourages this environment.

**(30)**   COUNTY fails in its obligations under Section 504 of the 1973 Rehabilitation Act and Title II of the Americans with Disabilities Act. COUNTY fails in these regards because it does not provide adequate training to its employees so these can recognize genuine impairments and recognized disabilities in citizens/suspects. COUNTY does not provide adequate training to its employees to enable them to make reasonable accommodations when contacting them. For example, in SMITH's case, SANCHEZ could have run his license plate, allowed SMITH to retrieve his identification from his vehicle, or allowed SMITH to call his wife. This would have enabled SMITH to provide the biographical information SANCHEZ demanded; notwithstanding the fact SANCHEZ never explained the purpose or justification for the initial contact. This lack of training causes discrimination and disparate treatment because employees do not know what to do. In SMITH's case, it led to a full-blown arrest and detention. Disabled persons and their needs are ignored, and are persecuted by Deputies for invoking their rights.

**(31)**   Final Policymaker Sheriff Javier Salazar creates, approves, directs, or tacitly condones the illegal 4th and 14th Amendment violations depicted in paragraphs (1-30) above. This "deliberate indifference" fails to remedially address the resulting Constitutional harms. Sheriff Salazar is directly responsible for COUNTY's STEP traffic interdiction policy and its corollary byproducts of detentions, illegal seizures, and searches. The STEP Program requires COUNTY Policymakers to tally arrest statistics, create patrol areas, and proffer a master plan to implement

the STEP arrest criteria. COUNTY Policymakers must also fill out and submit the yearly STEP grant paperwork. In fact, all of the aforementioned COUNTY policies, practices, or customs possess the common theme of producing unlawful seizures and searches. COUNTY's Deputies and Sheriff recognize these harms, and deftly use "retroactive" searches and discoveries in attempting to validate unlawful arrests. Sheriff Salazar is aware of these policies through formal ratification and adoption, through civil lawsuits against COUNTY, through Internal Affairs complaints, and through the media.

**(32)** SMITH was illegally seized and experienced a *de facto* arrest. No underlying criminality was present. SMITH suffered the indignity and illegality of being handcuffed, searched, detained, and arrested. SANCHEZ rummaged through SMITH's car and its possessions. No criminal charges issued. Finally, SMITH endured the stigma and shame of being branded as "insane" and "deranged." This culminated in his brief mental health confinement. This retroactive ploy sought to justify the unlawful acts committed by SANCHEZ. Ultimately, SMITH is receiving bills and statements for his involuntary seizure, his transport, and medical evaluation. Further, Smith's wrists endured lasting injury from the excessively tight handcuffs.

## PLED FACTS OVERCOMING QUALIFIED IMMUNITY

(Paragraphs **1-32** are incorporated in their entirety)

**(33)  a.** SMITH was never directly accused of violating a criminal statute by SANCHEZ. **b.** SMITH did not violate any criminal law or statute on April 14, 2021. **c.** SMITH and SANCHEZ were never in contact with one another on April 14, 2021. **d.** SANCHEZ was not dispatched to SMITH's location. **e.** There was not a service call concerning SMITH. **f.** SMITH was not free to leave or ignore SANCHEZ at any time; the contact was not consensual. **g.** SMITH had a diagnosed disability, Dyslexia, and told this to SANCHEZ. **h.** SANCHEZ treated SMITH worse after announcing his disability, and made no accommodations for him. **i.** For this reason, SANCHEZ decided to 'punish' SMITH for being unable to mentally recall autobiographical information, rather than allowing SMITH to physically retrieve it. **j.** SANCHEZ physically seized, handcuffed, and placed SMITH in the back of ESPINO's cruiser

with no relationship to any alleged offense. **i.** This seizure was an arrest, as SMITH was never free to leave, and did not leave custody. **k.** SMITH was mentally cogent, and was not violent, aggressive, depressed, anxious, or self-destructive. **l.** SMITH had no guns, drugs, weapons, or contraband on his person, or in his possession. **m.** SMITH never threatened SANCHEZ or anyone else on April 14, 2021. **n.** SMITH was never charged with any criminal offense.

**o.** SANCHEZ tightened the handcuffs to such a degree, they cut deeply into SMITH's wrists and nerves. This occurred during the process of shoving SMITH downward and contorting his limbs. The handcuffs cut into wrist tissue which caused pain, injury, and loss of hand utility for some time. **p.** The STEP Program encourages a vast array of arrests for traffic related conduct. **q.** This generates money for BEXAR COUNTY, and extra pay for Deputies. **r.** Deputy SANCHEZ rummaged through all of SMITH's possessions, in and out of his car. **s.** SANCHEZ actually conducted chemical tests on some of SMITH's items in his car. **t.** The Ambulance E.M.T.s did not detect any mental or emotional distress in SMITH, and did not wish to transport him for a mental detention. **u.** The Hospital instructed the Ambulance E.M.T.s not to transport SMITH to the Hospital. **v.** SANCHEZ ordered the Ambulance drivers to transport SMITH to the Hospital, knowing they did not feel it was justified. **w.** University Hospital immediately discharged SMITH upon arrival. **x.** The doctors could detect no mental, or emotional distress. They felt SMITH was cogent, alert, emotionally stable, and no danger to himself or others. **y.** SMITH still feels the after-effects of the tightly fastened handcuffs. **z.** SMITH is still traumatized by this event, by his seizure, and being forcefully transported to a Hospital as a 'loony.' **aa.** SANCHEZ acted according to his training and BEXAR COUNTY policies in his dealings with SMITH on April 14, 2021.

# LEGAL CLAIMS

## VIII.

### CLAIMS AGAINST DEPUTY SANCHEZ

Paragraphs **(1-33)** are incorporated in their entirety.

### 4th AMENDMENT UNLAWFUL *TERRY STOP*

**(34)**   No articulable facts or reasonable suspicion could exist because there was no underlying

criminality. SMITH and SANCHEZ never had the opportunity to interact. SMITH was initially engaged in a prolonged *Terry* stop which produced no criminality, weapons, or contraband. The interaction blossomed into a full-blown arrest. No criminal charges were even mentioned, and did not issue. SMITH was harmed and suffered the 4th Amendment violation of the unlawful intrusion of law enforcement.

## 4th AMENDMENT UNREASONABLE SEIZURE: FALSE ARREST

**(35)**  SMITH was unlawfully contacted, seized and arrested by SANCHEZ. No probable cause to arrest was present because there was no predicate criminal act. No criminality was present to justify a seizure. No criminal charges issued. SMITH was harmed and suffered the indignity of being handcuffed, confined, arrested, and transported to University Hospital in violation of the 4th Amendment.

## 4th AMENDMENT UNREASONABLE SEARCH OF SMITH'S PERSON

**(36)**   SMITH was unlawfully contacted, seized and arrested by SANCHEZ. No probable cause to arrest was present because there was no predicate criminal act. No criminality was present to justify a seizure. No criminal charges issued. SMITH was searched. SMITH's body and personal property were searched. SMITH was never thought to be a or pose a physical threat to the Deputies. SMITH suffered violation of his 4th Amendment rights through a search without a lawful predicate.

## 4th AMENDMENT UNREASONABLE SEARCH OF SMITH'S CAR

**(37)**   SMITH was unlawfully contacted, seized and arrested by SANCHEZ. No probable cause was present because there was no predicate criminal act. No criminality was present to justify a seizure. No criminal charges issued. SMITH was searched. SMITH's car and personal property were searched. Some property was chemically analyzed. SMITH suffered a violation of his 4th Amendment rights through a search without a lawful predicate.

## 4th AMENDMENT EXCESSIVE FORCE

**(38)**  In handcuffing SMITH, SANCHEZ forced and shoved SMITH downward. SANCHEZ forcefully twisted and contorted SMITH's arms behind his back, while clicking and securing the handcuffs to an excruciating degree of tightness. This extreme tautness caused the shackles to cut into SMITH's tissue and nerves. The handcuffs cut into SMITH's wrists, causing pain, discomfort, and visible exterior trauma. SMITH had persistent symptoms after this incident, with continued pain, discomfort, swelling, cuts, and reduced mobility of his wrist joints.

## 4th & 14th AMENDMENT: UNLAWFUL MENTAL HEALTH SEIZURE/CONFINEMENT

**(39)**  SMITH endured a baseless intrusion on his freedom, his bodily integrity, and his liberty. SANCHEZ directed a summary mental health detention as a means of justifying SMITH's arrest. This went against the wishes of the Hospital and the E.M.T.s. Upon arrival at University Hospital, SMITH was summarily discharged on his own accord. No mental or emotional symptoms could be observed by Hospital staff. SMITH had no process where he could contest his summary arrest and detention prior to his transportation to the Hospital.

## FEDERAL DISABILITIES ACT CLAIMS AGAINST BEXAR COUNTY, TEXAS

Paragraphs **(1-39)** are incorporated in their entirety.

## DEFECTIVE AMERICANS WITH DISABILITIES ACT OF 1990 POLICIES

**(40)**  SMITH is a qualified individual with a disability. SMITH had a diagnosed learning disability of Dyslexia. SANCHEZ refused to make accommodations or allowances for this disability when SMITH was unable to recite numerical data or information. In fact, SANCHEZ retaliated and discriminated because of it. Instead of fulfilling his duty to "serve and protect," SANCHEZ responded with an unlawful seizure and mental health detention. COUNTY doesn't train Deputies to recognize individuals with disabilities. COUNTY doesn't train Deputies to make reasonable accommodations for those who are disabled. When in doubt, Deputies disregard these disabilities and treat citizens disparately because of them.

17

## DEFECTIVE SECTION 504 OF THE 1973 REHABILITATION ACT POLICIES

**(41)**    SMITH is a qualified individual with a disability. SMITH had a diagnosed learning disability of Dyslexia. SANCHEZ refused to make accommodations or allowances for this disability when SMITH was unable to recite numerical data or information. In fact, SANCHEZ retaliated and discriminated because of it. Instead of fulfilling his duty to "serve and protect," SANCHEZ responded with an unlawful seizure and mental health detention. COUNTY doesn't train Deputies to recognize individuals with disabilities. COUNTY doesn't train Deputies to make reasonable accommodations for those who are disabled. When in doubt, Deputies disregard these disabilities and treat citizens disparately because of them.

## *MONELL* CLAIMS AGAINST BEXAR COUNTY, TEXAS

Paragraphs **(1-41)** are incorporated in their entirety.

## BEXAR COUNTY'S NOTORIOUS STEP PROGRAM

**(42)**  COUNTY utilizes the STEP Program as a traffic tool to generate unlawful contacts, detentions, seizures, and arrests. The goal is incentivized arrests, rewarded through STEP grant money to COUNTY. The STEP Policy is approved by Final Policymaker Sheriff Javier Salazar, who is oblivious to the resulting harms.

## BEXAR COUNTY'S DEFECTIVE 4th AMENDMENT *TERRY* STOP TRAINING

**(43)**  COUNTY trains its Deputies that subsequent discoveries can validate an unlawful arrest. COUNTY trains its Deputies that probable cause can develop after a suspect is already arrested. COUNTY trains its Deputies to arrest suspects first, and validate the arrests with discoveries of contraband, weapons, or drugs. COUNTY does not place limits on the nature of its searches. Final Policymaker Sheriff Javier Salazar is aware of the resulting harms because it is standard training, and is oblivious to correct them.

18

## <u>BEXAR COUNTY'S DEFECTIVE 4th AMENDMENT SEIZURE TRAINING</u>

**(44)**  COUNTY trains its Deputies that subsequent discoveries can validate an unlawful arrest. COUNTY trains its Deputies that probable cause can develop after a suspect is already arrested. COUNTY trains its Deputies to arrest suspects first, and validate the arrests with discoveries of contraband, weapons, or drugs. COUNTY does not place limits on the nature of its searches. COUNTY does not place limits on Deputy contacts with citizens. Reasonable Suspicion and Probable Cause standards are not associated with articulable facts of extant criminality. Final Policymaker Sheriff Javier Salazar is aware of the resulting harms because it is standard training, and is oblivious to correct them.

## <u>BEXAR COUNTY'S UNLAWFUL MENTAL HEALTH DETENTION PRACTICES</u>

**(45)**  COUNTY trains its Deputies that subsequent discoveries can validate an unlawful arrest. COUNTY trains its Deputies that probable cause can develop after a suspect is already arrested. COUNTY trains its Deputies to arrest suspects first, and validate the arrests with discoveries of contraband, weapons, or drugs. If no discovery of contraband occurs, COUNTY instructs its Deputies to authorize involuntary mental health detentions. This distracts from the illegal seizures and searches, and provides overtime pay. Final Policymaker Sheriff Javier Salazar is aware of the resulting harms because it is a standard policy, and is oblivious to correct them.

## <u>BEXAR COUNTY'S FAILURE TO SUPERVISE</u>

**(46)**  COUNTY creates an environment which authorizes 4th Amendment violations. Deputies are allowed to displace the 4th Amendment through illegal contacts, detentions, arrests, and searches. Deputies are encouraged to generate arrests, whether or not they have a criminal predicate. The rank and file become a law unto themselves. Final Policymaker Sheriff Javier Salazar is aware of the resulting harms because it is a standard policy, and is oblivious to correct them.

## BEXAR COUNTY'S FAILURE TO DISCIPLINE

**(47)**  COUNTY creates an environment which authorizes 4th Amendment violations. Deputies are allowed to displace the 4th Amendment through illegal contacts, detentions, arrests, and searches. Deputies are encouraged to generate arrests, whether or not they have a criminal predicate. The rank and file become a law unto themselves. Final Policymaker Sheriff Javier Salazar is aware of the resulting harms because it is a standard policy, and is oblivious to correct them.

## BEXAR COUNTY'S POLICY OF CONCEALING PUBLIC INFORMATION

**(48)**  COUNTY willfully hides, conceals, withholds, or destroys information which tends to show COUNTY liability, or that of its employees. This can include documents created and stored by law enforcement. The purpose of these acts is to obstruct the possession of this information by the aggrieved parties. The ultimate aim is to prevent the use of this information as the basis of a lawsuit, or as evidence of legal liability. The design is to limit or constrain the right of access to the courts, or a citizen's right to petition the government for redress under the 1st Amendment. COUNTY employees and agents implement this policy under the direction of policymakers.

## DELIBERATE INDIFFERENCE

**(49)**  COUNTY's Final Policymaker, Bexar County Sheriff Javier Salazar, is aware of the foibles of the STEP program because he must submit yearly applications and patrol plans. COUNTY tabulates the arrest statistics and publicizes them on Facebook. Salazar is also aware of defects in COUNTY policies through lawsuits filed against it in federal and state courts under 42 U.S.C. 1983. Finally, other COUNTY failures in training and supervision are byproducts of the STEP program, where the 4th Amendment yields to pretextual contacts and arrest quotas. COUNTY makes intentional choices by imparting flawed 4th Amendment training principles on subjects such as *Terry* stops, reasonable suspicion, and probable cause with the position that retroactive discoveries can validate unlawful arrests.

IX.                                **DAMAGES**

Paragraphs **(1-49)** are hereby incorporated in their entirety.


**(50)**                        **RAMIRO SANCHEZ**

Plaintiff seeks Compensatory Damages against Defendant SANCHEZ for unlawful seizures and searches of his person, and his property. SMITH seeks damages for an unlawful and unjustified mental health detention in the amount of $4,000,000.00 United States Dollars.

Plaintiff seeks Punitive Damages against Defendant SANCHEZ for outrageous conduct, and to serve notice that such conduct is not tolerated in a civilized society.


**(51)**                    **BEXAR COUNTY, TEXAS**

Plaintiff seeks Compensatory Damages against COUNTY for improperly hiring, training, and supervising Deputies who violate citizens' rights according to informal and formal policies and directives in the amount of $5,000,000.00 United States Dollars.


X.                               **JURY DEMAND**

Plaintiff invokes his right to a Jury Trial on all issues triable, overseen by a Federal District Judge, pursuant to the Federal Rule of Civil Procedure 38.


XI.                                 **PRAYER**

Wherefore, premises considered, Plaintiff Ronald Smith respectfully prays for the following relief:

(a) Compensatory Damages in the pled amounts will be awarded against Defendants SANCHEZ, and COUNTY;

(b) Punitive Damages in the appropriate amounts will be awarded against Defendant SANCHEZ,

(c) Reasonable Attorney fees will be awarded under 42 U.S.C. 1988;

(d) Costs of suit;

(e) Plaintiff will be awarded any other relief he shows himself entitled to, in equity or at law.

Respectfully Submitted,

***/s/ Andres Cano***

Andres Cano
Plaintiff's Attorney
Texas Bar 24100071
1140 South Laredo
San Antonio, Texas 78204
(210) 320-2020
(210) 263-7667 (fax)
dx4829@gmail.com

## CERTIFICATE OF SERVICE

I affirm a true and correct copy of this document was sent via electronic transmission to the following persons on June 4, 2023:

Jose Herrera
Defendants' Counsel
Bexar County District Attorney's Office
jose.herrera@bexar.org

# **ATTACHMENTS**

**Att: A:**     **2021 Texas S.T.E.P. Traffic Interdiction Grants/Awards**

**Att. B:**     **Texas Attorney General Complaint against Bexar County**
**for withholding Public Information (videos) of these events**
**(Complaint OR-23-000271-IC)**

# ATTACHMENT A



Texas
Department
of Transportation

# TRAFFIC SAFETY PROGRAM
# REQUEST FOR PROPOSALS
# FY 2021 STEP GRANTS

Prepared and Developed by:
The Staff of the Traffic Safety Section

Traffic Safety Division
125 E. 11th Street
Austin, Texas 78701-2483
(512) 416-3200
http://www.txdot.gov/inside-txdot/division/traffic.html



November 8th, 2019

# Table of Contents

*Section One – Overview* ...................................................................................................3

   Summary ........................................................................................................................4

*Section Two – Selective Traffic Enforcement Program (STEP) Grants*............................6

   Eligibility for Funding ...................................................................................................7

   Enforcement Requirements ..........................................................................................7

*Section Three – Grant Types and Definitions* ................................................................8

   STEP Comprehensive (COMP) Grants .........................................................................9

   STEP Commercial Motor Vehicle (CMV) Grants ....................................................... 10

*Section Four – Additional Requirements* ..................................................................... 13

   Operational Plan ........................................................................................................ 14

   Public Information & Education (PI&E) ...................................................................... 15

*Section Five – Policies & Procedures* ........................................................................... 16

   Policies & Procedures ................................................................................................ 17

   Internal Ethics & Compliance ................................................................................... 18

*Section Six – Proposal Submission* .............................................................................. 19

   Schedule .................................................................................................................... 20

# SECTION ONE
# OVERVIEW

**Texas Traffic Safety Program**
**FY 2021 Request for Proposals – STEP Grants**

## Summary

Texas' Selective Traffic Enforcement Program (STEP) is a federally funded law enforcement grant program run by the Traffic Safety Division at the Texas Department of Transportation. STEP enforcement is focused on reducing crashes and crash-related injuries and deaths in and across Texas. Any accredited law enforcement agency in Texas is eligible for funding through STEP, though priority to receive the funds and the maximum funding amount an agency may receive is based on the number and type of crashes occurring in the applicant jurisdictions.

Agencies participating in STEP must use crash data provided by the Texas Crash Reporting Information System (CRIS), and analyzed and plotted by the Texas Department of Public Safety's Highway Safety Operations Center (HSOC), to develop Enforcement Zones, which are limited in number and size to help magnify the impact of the enforcement efforts on troublesome crash areas.

Agency performance will be measured by the number of STEP-funded vehicle stops made within the established Enforcement Zones, and by the impact the enforcement has on the jurisdiction's crash totals. To maximize the value of the vehicle stops conducted during STEP enforcement, agencies are strongly encouraged to design their Enforcement Zones and conduct subsequent enforcement efforts in and around intersections, which are planned points of conflict on the transportation system.

TCOLE-certified training supporting all aspects of STEP enforcement, including grant proposal and Enforcement Zone development, grant administration, data quality and analysis, operational philosophy and strategies, and child-passenger and officer safety courses are available free-of-charge through the [Texas Law Enforcement Liaison program](). The training courses are designed to help agencies stay current on the latest information and enforcement concepts, and to realize the maximum value STEP enforcement can provide to the agency and the community.

Maximum budget amounts for each agency for Selective Traffic Enforcement Program (STEP) grants have been determined using KA (fatal and serious-injury) crash data from the Crash Records Information System (CRIS) and a weighted funding formula to determine eligible amounts for each agency:

- DWI/DUI - Driving While Intoxicated/Driving Under the Influence
- OP - Failure to Use Occupant Restraint, including child-passenger safety seats
- ITC - Intersection Traffic Control
- SP - Speed Enforcement /Control
- DD - Distracted Driving

Agencies may choose to receive less than the maximum amount for which they qualify based on the formula and agencies not listed for a specified amount may receive up to $12,000 for a STEP-COMP grant and/or a $12,000 CMV grant.

Proposing agencies may ask TxDOT personnel for assistance in developing their STEP proposal(s).

Click-It-Or-Ticket and Impaired Driving Mobilization Proposals will not be accepted through this Request for Proposal; however, they will be accepted through a separate process. For more information regarding mobilizations, please contact Larry Krantz, TxDOT Police Traffic Services Program Manager.

Once a proposal is submitted, the requested Federal award cannot be increased.  A budgetary adjustment may be necessary if the budget is inaccurate, unreasonable, or unallowable. Minor modifications may be made during the grant negotiations process.
See attached budget limits (Attachment A).

# SECTION TWO
# SELECTIVE TRAFFIC ENFORCEMENT PROGRAM (STEP) GRANTS

**Texas Traffic Safety Program**
**FY 2021 Request for Proposals – STEP Grants**

## Eligibility for Funding

STEP grant funding assists in paying for overtime enforcement activities conducted by Texas law enforcement agencies. STEP enforcement activities should prioritize crash reduction by conducting mobile, high-visibility enforcement in high-crash areas within the law enforcement agency's jurisdiction. Officers should focus their efforts on reducing incidences of intersection-related violations, driving while intoxicated, failure to use occupant restraint systems, enforcement of state and local ordinances on cellular and texting devices and speeding within the high-crash areas they identify.  In order to participate in STEP, the agency must have an active overtime policy that allows for STEP enforcement to occur.

Organizations eligible for STEP funds include the Texas Department of Public Safety (TxDPS), sheriff's offices, constable's offices, local police departments, and inter-governmental coordination entities for law enforcement efforts; i.e. COGs.

## Enforcement Requirements

The following items are requirements for enforcement on both STEP-COMP and STEP-CMV grants:

- Proposers are required to contribute at least 20% of the total budget in approved match.

- All enforcement activities must be initiated within, or in route to or from, an established Enforcement Zone as outlined in the grant's Operational Plan.

- A minimum number of documented vehicle stops must be made during each hour of enforcement so that enforcement efforts are consistent throughout the assigned shift. The minimum number of stops required depends on the grant type and is detailed in the following sections.

# SECTION THREE
# GRANT TYPES & DEFINITIONS

# Texas Traffic Safety Program
# FY 2021 Request for Proposals – STEP Grants

## STEP-Comprehensive (COMP) Grants

Officers conducting enforcement on a STEP-COMP grant will make enforcement of Intersection Traffic Control, Impaired Driving, Occupant Protection, Distracted Driving and Speed their top priority during enforcement, although any traffic-related probable cause may be used to initiate a vehicle stop. In order for a vehicle stop to be counted toward the agency's grant performance, the vehicle stop must be initiated for infractions witnessed inside of, or in route to or from an established Enforcement Zone. For purposes of documentation, each officer's Daily Activity Report should reflect the Enforcement Zone in which the stop was made, the time and specific location of the stop (i.e. 4800 block of South Broadway), and at what time individual vehicle stops were made. The officer should run the offender's driver license for warrants, run the vehicle registration for its history, and must document taking one of the following three actions:

- Issuing a written warning
- Issuing a citation
- Making an arrest

Agencies will document and report the numbers of warnings, citations and arrests made on STEP time to TxDOT at the end of each month, but there will be no target numbers established for each individual element. STEP-COMP agencies will be considered to be in compliance with TxDOT performance expectations as long as they document making a minimum average of 2.5 vehicle stops per hour for each enforcement hour and show that minimum activity in each STEP enforcement hour. STEP-COMP subgrantee agencies should make it a priority to conduct enforcement activities during state and federally determined holiday periods, which are:

- Christmas/New Year's (Dec. 18, 2020-Jan. 1, 2021)
- Spring Break (Mar. 5-21, 2021)
- Memorial Day (May 24-June 6, 2021)
- Independence Day (June 25-July 11, 2021)
- Labor Day (Aug. 20-Sept. 6, 2021)

Maximum budget amounts for STEP-COMP grants have been determined using crash data from CRIS, with a weighted funding formula to determine eligible amounts for each agency. The budget amount listed is the maximum offer for FY 2021. Agencies may choose to receive less than the maximum amount for which they qualify based on the formula. Funding amounts may vary from year to year based on crash data, but agencies will not be given any more than a 10% increase from their

9

# Texas Traffic Safety Program
# FY 2021 Request for Proposals – STEP Grants

FY 2020 grant amount, nor be reduced by more than 10%. Any increases or decreases are reflected in the agency-specific budget amounts in this document. Agencies not listed for a specified amount may receive up to $12,000 for a STEP-COMP grant and/or a $12,000 CMV grant.  Funds are authorized on a Federal fiscal year basis only and awarded grants are contingent upon the availability of Federal funds.

**Baseline Enforcement Information**

Baseline enforcement information serves as a foundation for proposers to measure non-grant traffic enforcement activity against that provided through STEP grants. This information must be provided by the proposers and includes the total number of arrests, citations and warnings made during non-STEP vehicle stops the proposing agency made in the past 12 months. The information must exclude any activity generated with STEP grant dollars. Once the enforcement baseline is established, these figures will be used to compare subsequent years' local- and grant-funded traffic enforcement activity against crash data the agency provides to TxDOT.

**Baseline KA Crash Data**

Proposers must enter the three-year-average KA crash data for their jurisdiction as it appears on the RFP Budget Document (Attachment A). The baseline numbers are critical in establishing the number and key contributing factors for fatal and serious-injury crashes in a community and are used to measure the effectiveness of grant-related enforcement efforts in reducing crashes.

County Sheriff's Departments and Constable's Offices should use the KA crash data for the county, found under "Rural (county name)." County-level agencies wishing to work STEP in counties not listed on the RFP can be awarded up to $12,000 each. Constable's Offices not operating a yearlong STEP grant in FY 2020 in counties where the Sheriff's Office is already a STEP participant must contact the STEP program manager to negotiate a STEP budget for that agency.

## STEP-Commercial Motor Vehicle (CMV) Grants

Requirements outlined in this section apply to all STEP grant proposals that offer commercial motor vehicle enforcement opportunities 365 days per year. Law enforcement agencies requesting or already operating a STEP-COMP grant may also request a STEP-CMV. Maximum funding levels for CMV grants have also been determined using crash data from CRIS and the funding formula based

on the CRIS data. Funding amounts may vary from year to year based on crash data, but agencies will not be given any more than a 10% increase from their FY 2020 grant amount, nor be reduced by more than 10%. Any increases or decreases are reflected in the agency-specific budget amounts in this document. Agencies wishing to enforce CMV but are not listed as a qualified agency may receive $12,000 in CMV funding.

County Sheriff's Departments and Constable's Offices should use the KA crash data for the county, found under "Rural (county name)." County-level agencies wishing to work STEP in counties not listed on the RFP can be awarded up to $12,000 each. Constable's Offices not operating a yearlong STEP grant in FY 2020 in counties where the Sheriff's Office is already a STEP participant must contact the STEP program manager to negotiate a STEP budget for that agency.

Officers conducting enforcement on a STEP-CMV grant should make enforcement of Impaired Driving, Occupant Protection, Hazardous Moving Violations, Distracted Driving and Speed their top priority during enforcement, although any traffic-related probable cause can be used to initiate a CMV stop. Officers may not weigh, inspect equipment or review driver logs while on STEP time. In order for a vehicle stop to be counted as part of the agency's grant performance, the vehicle stop must be initiated for infractions witnessed inside of, or in route to or from, an established Enforcement Zone. For purposes of documentation, each officer's Daily Activity Report should reflect the Enforcement Zone in which the stop was made, the time and specific location of the stop (i.e. 4800 block of South Broadway), and at what time individual vehicle stops were made.

The officer should run the offender's driver license for warrants, run the vehicle registration for its history, and must document taking one of the following three actions:

- Issuing a paper warning
- Issuing a citation
- Making an arrest

Agencies must document and report the numbers of such warnings, citations and arrests made on STEP time to TxDOT at the end of each month or enforcement period, but there will be no target numbers established for each individual element. Agencies will be considered to be in compliance with TxDOT performance expectations as long as they maintain an average of one (1) stop involving a commercial motor vehicle or more during each hour of STEP-CMV enforcement.

# Texas Traffic Safety Program
## FY 2021 Request for Proposals – STEP Grants

**Baseline Enforcement Information**

Baseline enforcement information serves as a foundation for proposers to measure non-grant traffic enforcement activity against that provided through STEP grants. This information must be provided by the proposers and includes the total number of arrests, citations and warnings made during non-STEP vehicle stops the proposing agency made in the past 12 months. The information must exclude any activity generated with STEP grant dollars. Once the enforcement baseline is established, these figures will be used to compare subsequent years' local- and grant-funded traffic enforcement activity against crash data the agency provides to TxDOT.

**Baseline KA Crash Data**

Proposers must enter the three-year-average KA crash data for their jurisdiction as it appears on the RFP Budget Document (Attachment A). The baseline numbers are critical in establishing the number and key contributing factors for fatal and serious-injury crashes in a community and are used to measure the effectiveness of grant-related enforcement efforts in reducing crashes.

12

# SECTION FOUR
# ADDITIONAL REQUIREMENTS

**Texas Traffic Safety Program**
**FY 2021 Request for Proposals – STEP Grants**

## Operational Plan

Agencies will use geolocated KA (Fatal and Serious Injury) crash data from the CRIS database to establish the foundation for at least two STEP Enforcement Zones within their jurisdiction. Crash heat maps for your jurisdiction are available by clicking here and then following the link to "TxDOT STEP Program Resources."

The purpose of the creation of STEP Enforcement Zones is to focus consistent high-visibility enforcement on areas with a history of high KA crashes, and zones should be developed and patrolled accordingly. Therefore, only KA crash data from the CRIS database may be used to initiate the creation of an Enforcement Zone. In the event that an agency has no KA crashes in its jurisdiction, TxDOT may approve, on a case-by-case basis, patrol zones based on other data available to the agency.

At a minimum, Enforcement Zones should be anchored by the locations of one or more KA crash and expanded to include areas of approach in any direction and for a reasonable distance from the crash site or sites in evidence. As a rule, Enforcement Zones should cover no more than four (4) square miles, although it may take the form of any logical shape. For example, in a city, the Enforcement Zone may align with the street grid and be centered on high-crash intersections, whereas on a rural highway, the patrol zone might encompass four contiguous miles that include the high-crash area(s), but do not include other areas outside of the highway's linear footprint.

Crash maps detailing the location of each KA crash used to develop the jurisdiction's funding will be provided by the Department of Public Safety through TxDOT.   Agencies must use these maps to develop and document their STEP Enforcement Zones.  At their option, agencies may also use other geolocated data from their own RMS to further define, augment and justify the perimeters of their Enforcement Zones.

All STEP Enforcement Zones must be approved by TxDOT prior to enforcement beginning. Identifying new Enforcement Zones after the grant begins is discouraged. STEP enforcement should be used to patrol areas identified through historical crash data, not to react to short-term trends. The number of Enforcement Zones allowed will vary by agency, but after the minimum of two zones, the further addition of zones will be based on the number of enforcement hours available on the grant. In order to qualify for additional zones, the requesting agency would need to have a minimum total of 1,000 enforcement hours on the grant.

## Texas Traffic Safety Program
## FY 2021 Request for Proposals – STEP Grants

STEP-CMV grants will also be location-based. Maps showing the locations of KA crashes involving CMV are available here.

## Public Information & Education (PI&E)

Law enforcement agencies are required to conduct PI&E activities, including the distribution of PI&E materials, throughout the grant period. Salaries being claimed for PI&E activities must be included in the budget. Proposal help for budgeting PI&E Salaries and Fringe Benefits is located here.

Law enforcement agencies are required to provide a minimum of 5 documented PI&E activities throughout the grant period. These should coincide with identified holiday mobilization periods and include appropriate motorist education efforts. For example, during the Memorial Day Mobilization period, otherwise known as Click-It-Or-Ticket, agencies should develop media opportunities focused on the importance of buckling up and properly securing children, or a similarly themed community event.

Agencies are encouraged to coordinate their PI&E efforts with their local TxDOT Traffic Safety Specialist.

# SECTION FIVE
# POLICIES & PROCEDURES

## Texas Traffic Safety Program
## FY 2021 Request for Proposals – STEP Grants

## Policies and Procedures

All STEP agencies must either have established written STEP operating policies and procedures, or develop policies and procedures prior to a STEP grant being executed. The program will certify that the applying agency has, or will develop such procedures during the proposal process in eGrants. Those policies and procedures must include at a minimum:

- **Roles and Responsibilities** – a description of which position serves as STEP project director and a list of their main responsibilities, including detailed information for supervisory review (i.e. timesheets, activity reports, citations, etc. and how often the reviews should occur) prior to reimbursement request.

- **STEP Shifts** – a description of how the agency selects individuals to work a STEP shift.

- **Authorization to Work** – a description of how prior approval is obtained for an individual authorized to work a STEP shift.

- **Work Restrictions** – a list of any restrictions imposed on working STEP, such as limitations on the number of hours an officer can work per shift, etc.

- **Supervision** – a description of how the agency supervises officers working STEP shifts.

- **Overtime Status** – a description on how the agency determines an individual's overtime status before working STEP.

- **Documentation** – a description of how an individual's time worked on a STEP shift is documented.

- **Required STEP Documentation** – a description of the paperwork that is required after the STEP shift ends (i.e., time sheets, overtime cards, STEP daily activity reports, citations).

- **Approval Process** – a description of the process the supervisor uses to approve and document the hours worked.

- **Performance Targets** – a description of the process used to oversee the agency's performance toward meeting the grant's performance measures/target numbers.

**Texas Traffic Safety Program**
**FY 2021 Request for Proposals – STEP Grants**

## Internal Ethics and Compliance Program

Each agency will be required to undergo a review by TxDOT's Internal Compliance Program prior to grant execution. Agencies must demonstrate compliance with Title 43 Texas Administrative Code §25.906(b) by certifying adoption of an internal ethics and compliance program that satisfies the requirements of Title 43 Texas Administrative Code §10.51 (relating to Internal Ethics and Compliance Program) prior to any grant execution.

# SECTION SIX
# PROPOSAL SUBMISSION

# Texas Traffic Safety Program
# FY 2021 Request for Proposals – STEP Grants

## Schedule

The proposal process schedule includes major milestones and target due dates culminating in an executed grant agreement.  The proposal submission due date is set; all others are subject to change. Any updates will be posted at:
https://www.txdot.gov/apps/eGrants/eGrantsHelp/rfp.html.

The following table outlines the proposal schedule:

| Activity / Milestone | Target Due Date |
|---|---|
| **Submission** | |
| Request for Proposals (RFP) Posted | 11/08/2019 |
| Proposal Submission Training for General/STEP Grants | 11/20/2019 |
| Deadline for Proposal Questions | 12/02/2019 @ Noon |
| Proposal Q&A Posted | 12/06/2019 |
| Deadline for Proposal Submission | 01/09/2020 |
| **Scoring and Negotiations** | |
| Proposals Scored | 02/21/2020 |
| Proposal Negotiations Completed | 04/13/2020 |
| **Funding Approval** | |
| Funding List and Minute Order Developed | 05/01/2020 |
| Funding Approved By Transportation Commission | 05/28/2020 |
| **HSP Development** | |
| HSP Drafted and Reviewed | 06/03/2020 |
| HSP Submitted to NHTSA | 07/01/2020 |
| HSP Approved and Published | 08/14/2020 |
| **Award Grants** | |
| Grants Awarded, Executed and Activated in eGrants | 10/01/2020 |

An eGrants system message will be sent to all law enforcement or other STEP agencies that are registered users of eGrants announcing this Request for Proposals. This message will be sent via eGrants on November 08, 2019.

Please refer any questions or comments about this process to Larry Krantz, TxDOT Police Traffic Services Program Manager.

| Jurisdiction | DUI-KA | OP-KA | SP-KA | ITC-KA | CMV-KA | Total-KA | Qualified CMV | Qualified COMP |
|---|---|---|---|---|---|---|---|---|
| ABILENE | 9 | 10 | 6 | 31 | 5 | 78 | $36,000 | $50,000 |
| AMARILLO | 20 | 12 | 5 | 61 | 4 | 129 | $45,000 | $144,000 |
| ARLINGTON | 35 | 28 | 18 | 68 | 7 | 185 | $55,000 | $178,000 |
| AUSTIN | 82 | 40 | 39 | 221 | 13 | 529 | $55,000 | $810,000 |
| BAYTOWN | 7 | 7 | 2 | 17 | 3 | 52 | $22,000 | $37,000 |
| BEAUMONT | 12 | 12 | 5 | 41 | 6 | 117 | $50,000 | $102,000 |
| BROWNSVILLE | 9 | 11 | 3 | 21 | 1 | 71 | | $72,000 |
| BRYAN | 7 | 7 | 2 | 16 | 1 | 43 | | $36,000 |
| CARROLLTON | 9 | 8 | 5 | 13 | 1 | 40 | | $40,000 |
| CEDAR PARK | 3 | 3 | 3 | 8 | 0 | 17 | | $13,000 |
| COLLEGE STATION | 5 | 3 | 2 | 24 | 1 | 41 | | $40,000 |
| CONROE | 9 | 7 | 5 | 24 | 2 | 60 | | $50,000 |
| CORPUS CHRISTI | 24 | 19 | 11 | 51 | 3 | 149 | $36,000 | $175,000 |
| DALLAS | 186 | 199 | 160 | 410 | 39 | 1080 | $50,000 | $857,000 |
| DEER PARK | 1 | 1 | 1 | 4 | 1 | 10 | | $37,000 |
| DENTON | 12 | 10 | 9 | 29 | 4 | 76 | $34,000 | $88,000 |
| EDINBURG | 6 | 5 | 2 | 18 | 2 | 39 | | $18,000 |
| EL PASO | 44 | 19 | 14 | 99 | 10 | 246 | $50,000 | $275,000 |
| EULESS | 1 | 0 | 0 | 8 | 0 | 16 | | $51,000 |
| FORT WORTH | 52 | 56 | 32 | 180 | 22 | 515 | $55,000 | $203,000 |
| FRISCO | 4 | 3 | 2 | 15 | 2 | 33 | | $65,000 |
| GALVESTON | 7 | 8 | 5 | 25 | 0 | 52 | | $43,000 |
| GARLAND | 12 | 13 | 10 | 53 | 5 | 115 | $50,000 | $158,000 |
| GRAND PRAIRIE | 16 | 18 | 10 | 30 | 5 | 85 | $50,000 | $127,000 |
| GRAPEVINE | 5 | 4 | 1 | 8 | 2 | 34 | | $36,000 |
| HARLINGEN | 6 | 4 | 3 | 16 | 0 | 35 | | $40,000 |
| HOUSTON | 166 | 154 | 64 | 496 | 38 | 1283 | $350,000 | $1,000,000 |
| IRVING | 19 | 16 | 16 | 29 | 2 | 82 | | $141,000 |
| KELLER | 1 | 1 | 1 | 3 | 0 | 5 | | $26,000 |
| KILLEEN | 11 | 9 | 12 | 31 | 0 | 65 | | $55,000 |
| LA PORTE | 5 | 2 | 0 | 4 | 1 | 12 | | $37,000 |
| LAREDO | 14 | 16 | 1 | 30 | 6 | 78 | $94,000 | $110,000 |
| LEWISVILLE | 8 | 9 | 7 | 22 | 3 | 53 | $25,000 | $65,000 |
| LONGVIEW | 8 | 11 | 9 | 19 | 1 | 45 | | $46,000 |
| LUBBOCK | 20 | 21 | 14 | 39 | 1 | 87 | | $50,000 |
| MCALLEN | 9 | 5 | 2 | 28 | 1 | 53 | $65,000 | $88,000 |
| MCKINNEY | 5 | 5 | 0 | 16 | 1 | 38 | | $61,000 |
| MESQUITE | 11 | 14 | 13 | 18 | 3 | 64 | $47,000 | $41,000 |
| MIDLAND | 14 | 15 | 11 | 30 | 3 | 77 | $46,000 | $23,000 |
| MISSION | 1 | 1 | 0 | 7 | 0 | 17 | | $46,000 |
| MISSOURI CITY | 1 | 2 | 0 | 11 | 0 | 20 | | $31,000 |
| NEW BRAUNFELS | 7 | 5 | 5 | 16 | 6 | 48 | $45,000 | $40,000 |
| NORTH RICHLAND HILLS | 3 | 1 | 4 | 12 | 0 | 28 | | $31,000 |
| ODESSA | 15 | 9 | 6 | 25 | 4 | 60 | $46,000 | $22,000 |
| PASADENA | 11 | 9 | 4 | 48 | 1 | 87 | | $76,000 |
| PLANO | 18 | 12 | 10 | 46 | 2 | 106 | | $130,000 |
| PORT ARTHUR | 3 | 5 | 2 | 12 | 2 | 38 | | $31,000 |

| Jurisdiction | DUI-KA | OP-KA | SP-KA | ITC-KA | CMV-KA | Total-KA | Qualified CMV | Qualified COMP |
|---|---|---|---|---|---|---|---|---|
| RICHARDSON | 6 | 7 | 2 | 21 | 0 | 49 | | $18,000 |
| ROUND ROCK | 5 | 4 | 3 | 16 | 1 | 47 | | $14,000 |
| SAN ANGELO | 3 | 4 | 2 | 15 | 0 | 27 | | $13,000 |
| SAN ANTONIO | 120 | 74 | 88 | 290 | 23 | 808 | $50,000 | $900,000 |
| SAN MARCOS | 7 | 4 | 4 | 17 | 2 | 44 | | $37,000 |
| SOUTHLAKE | 0 | 0 | 0 | 3 | 0 | 4 | | $31,000 |
| SUGAR LAND | 4 | 2 | 1 | 12 | 2 | 27 | | $44,000 |
| TEXAS CITY | 6 | 5 | 4 | 7 | 1 | 31 | | $21,000 |
| TEXAS DPS | | | | | | | | $500,000 |
| TYLER | 6 | 7 | 3 | 31 | 2 | 66 | | $58,000 |
| VICTORIA | 6 | 8 | 3 | 8 | 0 | 28 | | $21,000 |
| WACO | 14 | 10 | 8 | 44 | 5 | 89 | $46,000 | $117,000 |
| WAXAHACHIE | 7 | 7 | 4 | 15 | 2 | 50 | | $35,000 |
| WICHITA FALLS | 8 | 5 | 4 | 14 | 0 | 32 | | $58,000 |
| ATASCOSA COUNTY | 7 | 9 | 6 | 7 | 7 | 39 | $40,000 | $22,000 |
| BASTROP COUNTY | 20 | 17 | 12 | 16 | 3 | 75 | $50,000 | $50,000 |
| BELL COUNTY | 11 | 9 | 15 | 8 | 4 | 52 | $40,000 | $50,000 |
| BEXAR COUNTY | 17 | 13 | 14 | 43 | 7 | 117 | $40,000 | $360,000 |
| BOWIE COUNTY | 12 | 14 | 6 | 10 | 4 | 49 | $50,000 | $50,000 |
| BRAZORIA COUNTY | 25 | 18 | 19 | 22 | 4 | 91 | $50,000 | $50,000 |
| BURLESON COUNTY | 7 | 5 | 4 | 4 | 4 | 20 | $44,000 | $22,000 |
| BURNET COUNTY | 8 | 7 | 10 | 6 | 1 | 35 | | $25,000 |
| CAMERON COUNTY | 13 | 12 | 10 | 10 | 1 | 38 | | $50,000 |
| CHAMBERS COUNTY | 9 | 12 | 9 | 6 | 6 | 44 | $50,000 | $55,000 |
| CHEROKEE COUNTY | 9 | 11 | 12 | 4 | 1 | 33 | | $50,000 |
| COMAL COUNTY | 10 | 4 | 10 | 15 | 2 | 45 | | $45,000 |
| DALLAS COUNTY | 3 | 1 | 1 | 4 | 0 | 10 | | $45,000 |
| ECTOR COUNTY | 22 | 29 | 13 | 39 | 18 | 96 | $50,000 | $50,000 |
| EL PASO COUNTY | 8 | 8 | 2 | 10 | 2 | 40 | $40,000 | $70,000 |
| ELLIS COUNTY | 14 | 10 | 13 | 4 | 4 | 43 | $50,000 | $50,000 |
| ERATH COUNTY | 8 | 13 | 10 | 6 | 4 | 39 | $50,000 | $50,000 |
| FORT BEND COUNTY | 18 | 15 | 8 | 39 | 4 | 95 | $50,000 | $126,000 |
| GILLESPIE COUNTY | 7 | 4 | 6 | 3 | 2 | 31 | | $22,000 |
| GRAYSON COUNTY | 16 | 10 | 13 | 7 | 3 | 47 | $41,000 | $50,000 |
| GREGG COUNTY | 8 | 6 | 6 | 10 | 4 | 38 | $27,000 | $25,000 |
| GRIMES COUNTY | 8 | 8 | 9 | 8 | 3 | 36 | $21,000 | $25,000 |
| GUADALUPE COUNTY | 10 | 8 | 10 | 9 | 5 | 48 | $34,000 | $32,000 |
| HARDIN COUNTY | 7 | 5 | 5 | 4 | 2 | 26 | | $22,000 |
| HARRIS COUNTY | 122 | 125 | 63 | 212 | 27 | 630 | $396,000 | $924,000 |
| HARRISON COUNTY | 15 | 12 | 11 | 7 | 7 | 47 | $50,000 | $50,000 |
| HAYS COUNTY | 15 | 9 | 18 | 13 | 1 | 54 | | $50,000 |
| HENDERSON COUNTY | 11 | 9 | 8 | 4 | 2 | 31 | | $35,000 |
| HIDALGO COUNTY | 29 | 28 | 20 | 37 | 4 | 100 | $50,000 | $50,000 |
| HOPKINS COUNTY | 7 | 8 | 9 | 3 | 2 | 26 | | $22,000 |
| HUNT COUNTY | 13 | 16 | 9 | 11 | 4 | 55 | $50,000 | $50,000 |
| JEFFERSON COUNTY | 9 | 6 | 3 | 4 | 4 | 32 | $37,000 | $29,000 |
| JOHNSON COUNTY | 19 | 17 | 21 | 16 | 2 | 86 | | $50,000 |

| Jurisdiction | DUI-KA | OP-KA | SP-KA | ITC-KA | CMV-KA | Total-KA | Qualified CMV | Qualified COMP |
|---|---|---|---|---|---|---|---|---|
| KAUFMAN COUNTY | 12 | 10 | 11 | 10 | 4 | 57 | $36,000 | $50,000 |
| KERR COUNTY | 8 | 3 | 8 | 4 | 3 | 31 | $25,000 | $25,000 |
| LIBERTY COUNTY | 9 | 9 | 6 | 11 | 5 | 48 | $41,000 | $39,000 |
| LUBBOCK COUNTY | 13 | 9 | 8 | 16 | 5 | 40 | $50,000 | $50,000 |
| MATAGORDA COUNTY | 11 | 12 | 10 | 8 | 0 | 33 |  | $50,000 |
| MCLENNAN COUNTY | 10 | 10 | 13 | 13 | 4 | 52 | $44,000 | $50,000 |
| MEDINA COUNTY | 7 | 8 | 6 | 4 | 2 | 25 |  | $22,000 |
| MIDLAND COUNTY | 12 | 14 | 6 | 18 | 20 | 56 | $50,000 | $50,000 |
| MILAM COUNTY | 9 | 5 | 4 | 1 | 3 | 25 | $35,000 | $29,000 |
| MONTGOMERY COUNTY | 57 | 36 | 41 | 51 | 8 | 208 | $136,000 | $352,000 |
| NACOGDOCHES COUNTY | 8 | 9 | 8 | 4 | 5 | 35 | $45,000 | $45,000 |
| ORANGE COUNTY | 7 | 2 | 3 | 5 | 2 | 21 |  | $22,000 |
| PANOLA COUNTY | 8 | 8 | 4 | 4 | 5 | 22 | $57,000 | $25,000 |
| PARKER COUNTY | 7 | 6 | 9 | 8 | 1 | 38 |  | $22,000 |
| PECOS COUNTY | 7 | 8 | 3 | 3 | 8 | 27 | $66,000 | $22,000 |
| POLK COUNTY | 8 | 12 | 9 | 11 | 5 | 46 | $50,000 | $50,000 |
| RANDALL COUNTY | 7 | 3 | 3 | 7 | 3 | 22 | $30,000 | $22,000 |
| RUSK COUNTY | 10 | 14 | 11 | 9 | 5 | 45 | $50,000 | $50,000 |
| SAN JACINTO COUNTY | 9 | 7 | 6 | 4 | 2 | 30 |  | $29,000 |
| SMITH COUNTY | 21 | 19 | 19 | 17 | 7 | 95 | $50,000 | $50,000 |
| TOM GREEN COUNTY | 4 | 4 | 2 | 5 | 2 | 18 |  | $37,000 |
| TRAVIS COUNTY | 33 | 27 | 28 | 39 | 4 | 154 | $50,000 | $55,000 |
| VAN ZANDT COUNTY | 13 | 12 | 16 | 13 | 2 | 64 |  | $50,000 |
| VICTORIA COUNTY | 11 | 9 | 5 | 11 | 4 | 42 | $43,000 | $45,000 |
| WALLER COUNTY | 8 | 8 | 7 | 6 | 7 | 36 | $35,000 | $28,000 |
| WILLIAMSON COUNTY | 18 | 13 | 12 | 23 | 4 | 74 | $50,000 | $55,000 |
| WISE COUNTY | 8 | 8 | 6 | 9 | 6 | 37 | $41,000 | $25,000 |

# ATTACHMENT B

# OAG Complaint Form Confirmation  Inbox ×

**Office of the Attorney General** <no-reply@oag.texas.gov>
to me

Apr 12, 2023, 8:53 PM

This e-mail will confirm receipt of your submission to the Office of the Attorney General regarding your open records complaint. If you have any questions regarding this complaint or the Public Information Act, please call the Open Government Hotline at (512) 478-6736 or toll free at 1-877-673-6839.

Submitted on Wed, 04/12/2023 - 20:41

Submitted values are:

## Requestor Information

**Requestor Contact Information**
Andres Cano
1104 South Laredo
San Antonio, Texas. 78204
dx4829@gmail.com
(210) 320-2020

## Governmental Body Information

**Governmental Body Contact Information**
Bexar County, Texas
Johnny Garcia
Bexar County Sheriff's Office
200 North Comal Street
San Antonio, Texas. 78207
johnny.garcia@bexar.org
(210) 275-2560

## Public Information Request at issue in Complaint

**How did you submit your public information request to the governmental body?**
Online form

**Date of your public information request:**
03/03/2023

**Did the governmental body ask you to pay for the requested information?**
No



KEN PAXTON
ATTORNEY GENERAL OF TEXAS

May 4, 2023

Mr. Johnny Garcia
Bexar County Sheriff's Office
200 North Comal Street
San Antonio, Texas 78207
Sent via e-mail.

Dear Mr. Garcia:

The Office of the Attorney General (the "OAG") has received a complaint from Mr. Andres Cano alleging the Bexar County Sheriff's Office (the "sheriff's office") has failed to respond appropriately to a request for information. The complaint was assigned ID# OR-23-000271-IC.

The Public Information Act (the "Act"), chapter 552 of the Texas Government Code, generally requires a governmental body to release requested public information that it collects, assembles, maintains, or has right of access to, or to request a ruling from the OAG as to the applicability of exceptions to the Act. Our records do not indicate a request for an OAG ruling has been made in accordance with section 552.301 of the Act.

Although the OAG has civil enforcement authority under the Act, our office prefers to work with governmental bodies and requestors to resolve complaints informally. The easiest way to resolve this open records complaint is to release the requested information, provided the information is not confidential by law.

Please provide a written response to this letter within 10 business days. *See* 1 T.A.C. § 70.11(d)(3) (governmental body has a responsibility under the Act to promptly respond). A certification form is enclosed with this letter in order to expedite your response. You may use the form to certify: (i) the requested information has been or will be released to the requestor; (ii) the sheriff's office has no information responsive to the request; or (iii) the sheriff's office has requested or will request an attorney general's decision regarding the requested information. If the form is not applicable, you may provide a written response to this notification letter explaining how the sheriff's office has complied with the Act. The written response may be sent to the address below or faxed to the Education and Enforcement Section at (512) 481-1992.

Mr. Johnny Garcia - Page 2

If you have any questions regarding this letter, please contact the Education and Enforcement Section of the Open Records Division at (877) 673-6839 or (512) 936-6736 to discuss the resolution of this complaint.  You will also find resources to assist you in complying with the Act at https://www.texasattorneygeneral.gov/open-government.

Thank you for your prompt attention to this matter.

Sincerely,

Education and Enforcement Section
Open Records Division

Enclosure

c:      Mr. Andres Cano
        Sent via E-mail.
        (w/o enclosure)

Mr. Johnny Garcia - Page 3

**PUBLIC INFORMATION ACT REQUEST CERTIFICATION FROM**
**GOVERNMENTAL BODY**
RE:  OAG ID# OR-23-000271-IC

*Please complete this form to indicate the manner in which the referenced request will be or has been answered.  Include your signature and date.*

I am the officer of public information, or the authorized representative, for the following governmental body (the "governmental body"):_____
_____ .

I am aware of a public information request to the governmental body from the requestor (the                                                                                  "requestor"):
_____ .

    *Please initial the certification that applies.*

    _____ I certify the governmental body has made available to the requestor all existing responsive information that this governmental body owns, controls, or has a right of access to.

    _____ I certify the governmental body has conducted a good faith search of information that this governmental body owns, controls, or has a right of access to, and has found no such information that is responsive to the requestor's public information request.

    _____ I certify the governmental body has supplied the requestor all existing responsive information for which the governmental body is not claiming an exception, and has requested an attorney general's decision regarding the responsive information the governmental body believes is excepted from disclosure.

Public Information Officer, or Authorized Representative

_____  _____
Signature                Date

_____  _____
Printed Name             Title