UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**RONALD SMITH,**

　*Plaintiff*,

v.　　　　　　　　　　　　　　　　　　　　Case No.  SA-23-CV-00623-JKP

**RAMIRO SANCHEZ,**

　*Defendant*.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Ramiro Sanchez's Motion for Summary Judgment. *See* ECF No. 23. Plaintiff Ronald Smith filed two responses and Sanchez replied to the responses. *See* ECF Nos. 25, 26, 30. The motion is fully briefed and ripe for ruling. For the reasons discussed herein, the Court finds, after viewing the facts in light of the available video evidence, no material fact dispute remains and judgment in favor of Officer Sanchez is appropriate as a matter of law. The Court, therefore, **GRANTS** Officer Sanchez's Motion for Summary Judgment and **DISMISSES** this case. *See* ECF No. 23. Final judgment will be entered by separate order.

### BACKGROUND

This case arises from an April 14, 2021 traffic stop in which Defendant Ramiro Smith, a Bexar County Sheriff's Deputy, who was driving a motorcycle, pulled over Plaintiff Ronald Smith, who was driving a black Toyota Camry, traveling North on Bulverde Road in Bulverde, Texas. Officer Sanchez informed Smith he was being pulled over for driving 61 miles per hour in a 40 mile per hour speed limit zone. Immediately upon being pulled over, Smith exited his car

and was evasive and hostile in response to Officer Sanchez's questions. Smith refused to provide his driver's license or date of birth and would not answer questions about whether he had a weapon or drugs. Officer Sanchez called for backup and handcuffed Smith, explaining he was doing so for both men's safety. When other officers arrived on the scene, they helped Officer Sanchez place Smith in the back of a police cruiser. Officer Sanchez then searched Smith's car, found Smith's wife's phone number, and called her. When asked whether Smith suffered from any mental health ailments, Smith's wife informed Officer Sanchez that Smith had anxiety. Officer Sanchez asked her to come to the scene, which she later did. From the back of the cruiser, Smith continued to engage with officers in a hostile manner, announcing he had COVID and hoped to spread it to the officers and yelling that he did not know his wife when she arrived. After conferring with his fellow officers and Smith's wife, Officer Sanchez determined it was unsafe for Smith to drive his vehicle and decided to transfer him to the hospital for a mental health evaluation.

      Smith brought this lawsuit, seeking compensation from Officer Sanchez under 42 U.S.C. § 1983 for allegedly violating his Fourth and Fourteenth Amendment rights, through unlawful search and seizure and pretextual mental health detention. Smith also sued Bexar County for allegedly adopting unlawful policies and practices and sued both defendants for violating federal anti-discrimination laws. In a prior Memorandum Opinion and Order, the Court dismissed all Smith's claims against Bexar County and all but his Fourth Amendment claims against Officer Sanchez. *See* ECF No. 22. In a supplemental briefing to his Motion to Dismiss, Officer Sanchez attempted to attach his body camera video as evidence. The Court determined the video evidence was a "matter outside the pleadings" under Rule 12(d) and converted the Rule 12(b)(6) Motion to Dismiss to a Rule 56 Motion for Summary Judgment for Smith's Fourth Amendment claims.

The Court then ordered Officer Sanchez to file an amended motion with the video evidence attached, to allow Smith an opportunity to review and respond to the evidence so the Court could properly consider it. *See* ECF No. 22. In the instant Motion for Summary Judgment, Officer Sanchez argues summary judgment is appropriate on Smith's remaining Fourth Amendment claims because, viewing the facts in light of the available video evidence, no material fact dispute remains. For the reasons discussed herein, the Court agrees.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] "As to materiality, the substantive law will identify which facts are material" and a fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a dispute over a material fact qualifies as "genuine" within the meaning of Rule 56. *Id*. Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id*. at 247–48. There is no genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

In determining whether to grant summary judgment, the courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016).

---

[1] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

3

"Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Id*. Furthermore, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

Factual allegations arising out of events captured on video are viewed "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. at 381. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. at 380. However, "to the extent that any material fact dispute remains after viewing the facts in light of the available video evidence, the court should deny summary judgment on grounds of qualified immunity." *Bagley v. Guillen*, — F.4th —, 2024 WL 107888 at *1 (5th Cir. 2024).

Generally, the affirmative defense of qualified immunity is an immunity from suit and shields a government official for actions within their discretionary authority when their conduct complies with clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005). Determination of the applicability of the qualified immunity defense requires two inquiries: (1) whether the official's conduct violated a clearly established constitutional right or statute, and (2) whether the official's conduct was objectively unreasonable under clearly established law existing at the time of the incident of which a reasonable person would have known. *Bey v. Prator*, 53 F.4th 854, 857 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 1783 (2023); *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009). If the Court answers both questions in the affirmative, the government official is not shielded from

liability based upon qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 232, (2009); *Buehler v. Dear*, 27 F.4th 969, 981–82 (5th Cir. 2022). A court need not analyze these prongs sequentially because if either is not satisfied, the government official is entitled to qualified immunity. *Buehler*, 27 F.4th at 981–82. Still, the Fifth Circuit provides guidance that although a district court may "'leapfrog' the first prong and resolve cases solely on the basis that defendants' conduct—even if unlawful—did not violate clearly established law, 'we think it better to address both steps in order to provide clarity and guidance for officers and courts.'" *Id*. at 981–82.

Although not presumed, when a defendant asserts the qualified-immunity affirmative defense, the burden of proving the affirmative of both prongs falls upon the plaintiff. *Buehler*, 27 F.4th at 981–82; *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). Consequently, when a government official asserts qualified immunity upon summary judgment, this assertion shifts the typical summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d at 253; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Instead, the summary-judgment initial burden falls on the plaintiff to demonstrate the inapplicability of qualified immunity by establishing a genuine dispute of material fact on both prongs of the inquiry. *Brown v. Callahan*, 623 F.3d at 252–53; *Poole*, 691 F.3d at 627–28. All inferences are still drawn in the plaintiff's favor. *Brown v. Callahan*, 623 F.3d at 253.

With regard to the first inquiry, the plaintiff must show there is a genuine dispute of material fact whether the defendant violated a constitutional right—that is, a jury could return a verdict entitling the plaintiff to relief for a constitutional injury. *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007). Because the summary-judgment initial burden falls on the plaintiff to demonstrate a genuine dispute of material fact on both prongs of the inquiry, if the Court

determines there is not a genuine dispute whether the alleged conduct violated a constitutional right, the official is entitled to qualified immunity upon summary judgment. *Buehler*, 27 F.4th at 981–82; *Poole*, 691 F.3d at 627–28; *Shepard v. Hansford Cnty.*, 110 F. Supp. 3d 696, 707–08 (N.D. Tex. 2015).[2]

With regard to the second inquiry, the plaintiff "must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct according to that law." *Tucker v. City of Shreveport*, 998 F.3d 165, 172–73 (5th Cir. 2021), *cert. denied sub nom.*, *Tucker v. City of Shreveport, Louisiana*, 142 S. Ct. 419 (2021); *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). The plaintiff has the burden to point out clearly established law, and the Court asks whether the defendant's actions were objectively unreasonable in light of the clearly established law at the time of the alleged constitutional violation. *See Freeman*, 483 F.3d at 411; *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019).

To meet this burden, the plaintiff need not identify a specific case, but a body of relevant caselaw in which an officer acting under similar circumstances was held to have violated the Constitution. *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018)). While there need not be a case directly on point, the unlawfulness of the challenged conduct must be beyond debate. *Id*. This leaves the rare possibility that, in an obvious case, analogous caselaw is not needed because

---

[2] The Court does recognize that some well-cited caselaw states the inquiry differently as: "the threshold 'constitutional violation question' [is] whether … the officer's alleged conduct violated a constitutional right…. If we determine that the alleged conduct did not violate a constitutional right, our inquiry ceases because *there is no constitutional violation for which the government official would need qualified immunity*." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (emphasis added).

the unlawfulness of the challenged conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Id.*

## ANALYSIS

In this case, Smith alleges Officer Sanchez violated Smith's Fourth Amendment right to be free from unlawful search and seizure and pretextual mental health detention. Officer Sanchez argues he is entitled to qualified immunity because Smith's mental health detention was justified under Texas law and, therefore, Officer Sanchez did not violate Smith's clearly established constitutional rights.

The Fourth Amendment, applied to state actors through the Fourteenth Amendment, guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *United State v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (*quoting* U.S. Const. amend. IV). Warrantless searches and seizures are *per se* unreasonable subject to certain narrow exceptions. *Cotropia v. Chapman*, 978 F.3d 282, 286 (5th Cir. 2020) (quoting *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002)). The government bears the burden of showing an exception applies. *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010) (quoting *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005)). One exception permits officers to conduct brief investigatory stops based on reasonable suspicion that the person is engaged in criminal activity or wanted in connection with a completed felony. *United States v. Hensley*, 469 U.S. 221, 229 (1985); *Terry v. Ohio*, 392 U.S. 1, 27–31 (1968); *see also United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc). A seizure "must be 'justified at its inception.'" *United States v. Thomas*, 997 F.3d 603, 609 (quoting *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004)). Reasonable suspicion therefore "must exist *before* the

7

initiation of an investigatory detention." *Ibid.* (quoting *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020)). In the context of a civil § 1983 Fourth Amendment claim, courts assess the reasonableness of an arrest by determining whether officers had "'probable cause to believe that a criminal offense has been or is being committed,' warrant or no warrant." *Jones v. Perez*, 790 F.App'x 576, 580 (5th Cir. 2019) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

Courts have recognized a traffic violation is an objectively reasonable basis on which to conduct a traffic stop. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). During such traffic stops, officers are permitted to detain individuals temporarily for instance, to "verify a violation of the traffic law has occurred or is occurring; and … to issue the appropriate ticket or citation charging the traffic violation or make an arrest of the driver based upon the violation." *United States v. Magana*, 544 F. Supp. 2d 560, 565 (W.D. Tex. 2008). Generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop…" *Lopez-Moreno*, 420 F.3d at 430. A recognized exception to this rule applies when officers obtain additional reasonable suspicion during the stop, but before the initial purpose of the stop has been fulfilled, in which case officers may continue the detention until the new reasonable suspicion has been dispelled or confirmed. *Id.* at 431. To determine the legality of a traffic stop, Courts apply the *Terry* framework, "asking first whether 'the officer's action was justified at its inception' that is, whether the initial stop was valid—and then whether the officer's subsequent actions 'were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop.'" *United States v. Villafranco-Elizondo*, 897 F.3d 635, 640 (5th Cir. 2018).

Officer Sanchez says his actions at the inception of the stop were justified by Smith's traffic violation—speeding—and Officer Sanchez's subsequent actions were justified under the

community caretaking exception to the warrant requirement. When assessing the propriety of a mental health detention under the community caretaking exception, courts examine whether officers had probable cause to detain the individual under the relevant state law. *Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012). Under Texas law, even in the absence of any suspicion of criminal activity, the community caretaking exception allows police officers, as part of their duty to "serve and protect," to stop or temporarily detain an individual whom a reasonable person would believe is in need of help given the totality of the circumstances. *See Wright v. State*, 7 S.W.3d 148, 151 (Tex.Crim.App.1999) (citing *Cady v. Dobrowski*, 413 U.S. 433 (1973)). However, in order to invoke the community caretaking function, the officer's primary motive must be concern for the individual's well-being. *Corbin v. State*, 85 S.W.3d 272, 277 (Tex.Crim.App.2002). In addition, the Fifth Circuit has recognized that an emergency medical detention is justified when: "(1) the officer has reason to believe and does believe that a person is mentally ill and because of that illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody." *Cantrell v. City of Murphy*, 666 F.3d at 923 (citing Tex. Health & Safety Code Ann. § 573.001);[3] *see also Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019).

In determining whether Officer Sanchez is entitled to qualified immunity, the Court must determine whether, under the first prong of the qualified immunity analysis, Officer Sanchez violated Smith's constitutional rights. *Freeman v. Gore*, 483 F.3d at 410. Smith therefore has the

---

[3] The Court notes the revised version of § 573.001, effective September 1, 2019, is substantively the same, reading: "(a) A peace officer, without a warrant, may take a person into custody, regardless of the age of the person, if the officer:
 (1) has reason to believe and does believe that:
  (A) the person is a person with mental illness; and
  (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and
 (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody."

burden of showing, based on the record evidence, the initial traffic stop was not justified by a traffic violation and Officer Sanchez's subsequent actions were not justified by the community caretaking exception. Courts typically view all facts and reasonable inferences in the light most favorable to the nonmovant, but when video evidence is available, a court may view the evidence "in the light depicted by the videotape" if the plaintiff's version of events is blatantly contradicted by the video evidence. *Scott v. Harris*, 550 U.S. at 381; *see also Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900 at n.13 (5th Cir. 2024).[4] In reviewing Officer Sanchez's body camera video, the Court finds the video evidence clearly supports Officer Sanchez's version of events.

As to the initial reason for the stop, the video evidence shows that immediately upon pulling Smith over, Officer Sanchez announced the reason for the stop was speeding. Specifically, Officer Sanchez told Smith, "You need to slow down," and indicated Smith was going "61 in a 40." *See* Def. Exh. A at 0:56; 1:05. Smith claimed he was not speeding, however, when Officer Sanchez asked why Smith was driving so fast, Smith said a car was chasing him. *Id*. at 1:50–52. When other officers arrived on the scene, Officer Sanchez told them he pulled Smith over for speeding and said Smith tried to get away from him. *Id*. at. 4:40–50. Officer Sanchez's statements to Smith and his fellow officers support Officer Sanchez's contention that he pulled Smith over for speeding. Smith attempts to undermine this evidence by suggesting Officer Sanchez stated he needs to recalibrate his radar, but that is not what Officer Sanchez said. In fact, it was Smith who suggested Officer Sanchez needed to recalibrate his radar, arguing he should not be ticketed for speeding because the radar must have been wrong. *Id*. at 20:40–45. Officer Sanchez responded, "Well, maybe I do, but that's not here or now." *Id*. at 20:46. The

---

[4] In a Memorandum Opinion and Order issued contemporaneously with this Memorandum Opinion and Order, the Court overruled Smith's objections to Officer Sanchez's body camera video evidence. The Court, therefore, treats the video evidence as admissible for the purposes of its summary judgment analysis.

Court interprets Officer Sanchez's response as a colloquialism, not an admission that something was wrong with the radar. The Court therefore finds the video evidence supports Officer Sanchez's valid reason for the traffic stop—he believed Smith committed a traffic violation by speeding.

Next, the Court must assess whether the video evidence supports Officer Sanchez's explanation for his subsequent actions under the community caretaking exception to the warrant requirement. Specifically, Officer Sanchez says he handcuffed Smith, placed Smith in the back of a police cruiser, searched Smith's person and car, and ultimately transported Smith to the hospital for a mental health evaluation because he believed Smith was experiencing a mental health crisis. Here again, the video evidence supports Officer Sanchez's version of events and blatantly contradicts Smith's version of events. From the outset of their encounter, Smith's behavior was unusual for a person being pulled over by police. Smith immediately exited his car upon being pulled over, refused to move his car to the side of the road, and claimed he was being chased by another car. *See* Def. Exh. A at 0:50–1:20. Smith said he did not have a driver's license and did not know his date of birth. *Id*. at 2:10–25. He then said he was illiterate and could not spell his name but he had a Commercial Driver's License. *Id*. at 2:25–50. Finding this suspicious, Officer Sanchez asked if he had been drinking or was on any medications. *Id*. at 2:50–3:00. Smith said he was not drinking or on medication but, when asked whether he had any weapons, Smith refused to answer. *Id*. at 3:00–30. At that point, Officer Sanchez handcuffed Smith "for my safety as well as yours." *Id*. at 3:30. Smith's behavior became increasingly belligerent as Officer Sanchez patted him down, refusing to sit on the curb, saying he left his drugs "at your girl's house," and he might have "tons of needles" on him. *Id*. at 3:30–4:30. When

other officers arrived on the scene, they put Smith in the back of a police cruiser and Officer Sanchez began telling them about Smith's suspicious behavior. *Id*. at 4:30–5:00.

The officers searched Smith's vehicle and ran his license plate, finding the car was registered to Smith. Officer Sanchez found Smith's wife's number on a piece of paper in the car, called it, and spoke with her. Officer Sanchez told Smith's wife Smith was speeding, driving erratically, and acting irrationally. *Id*. at 10:00–20. When Officer Sanchez asked if Smith was on any medication or under a doctor's care for any mental health issues, Smith's wife said he was not but he gets anxiety. *Id*. at 10:00–11:55. Officer Sanchez then asked Smith's wife to come to the scene and she agreed. *Id*. at 11:55–12:20. The rest of the video depicts Officer Sanchez working with fellow officers, his supervisor, Smith's wife, and Smith himself to determine how best to handle the situation. Throughout the encounter, which lasted more than an hour, Officer Sanchez maintained a calm, professional, respectful demeanor, frequently expressing concern for Smith's well-being. Indeed, Officer Sanchez told Smith, who was refusing to talk, that Officer Sanchez was only concerned with Smith's safety and well-being, asking if Smith wanted them to call an ambulance. *Id*. at 19:00–20. Officer Sanchez repeated his concerns to Smith's wife when she arrived. *See* Def. Exh. B at 5:45. Finally, in a conversation with his Sergeant, Officer Sanchez expressed concern that Smith was a danger to himself or others. *Id*. at 7:37.

Smith's demeanor, in contrast, was increasingly erratic and hostile. When Smith's wife arrived on the scene, Smith began shouting from the back of the police car that he did not know her. *Id*. at 0:15. Smith can also be heard announcing that he tested positive for COVID three days prior and hoped the officers on the scene would all get it. *Id*. at 2:12. Smith further told the officers he will not lick their boots and claimed, inaccurately, that Officer Sanchez almost hit his car. *Id*. at 3:00. A review of the video depicting the beginning of the traffic stop reveals Officer

12

Sanchez's motorcycle did not almost hit Smith's car. Smith attempts to undermine Officer Sanchez's claim that he was concerned about Smith's mental health by referencing an exchange between Officer Sanchez and a fellow officer. Here again, Smith mischaracterizes what the video evidence shows. Smith says Officer Sanchez said he did not think it was a mental issue. *See* ECF No. 26 at 10. What Officer Sanchez actually said is he did not know about mental health, meaning he did not know whether to consult a mental health professional. *See* Def. Exh. A at 24:40–25:50. Officer Sanchez's fellow officer said at first he thought Smith was impaired, but based on the fact that Smith had recently thrown up and was foaming at the mouth, the officer thought a medical evaluation was appropriate. *Id*. Officer Sanchez then agreed they should consult a mental health professional. *Id*. This evidence, taken together, clearly shows Officer Sanchez's primary motive was concern for Smith's well-being. *Corbin v. State*, 85 S.W.3d at 277. That is, Officer Sanchez's emergency medical detention of Smith was justified under Texas law because (1) Officer Sanchez had reason to believe and did believe Smith was mentally ill and because of that illness Smith posed a substantial risk of serious harm to himself or others unless immediately restrained; and (2) Officer Sanchez believed that there was not sufficient time to obtain a warrant before taking Smith into custody." *Cantrell v. City of Murphy*, 666 F.3d at 923 (citing Tex. Health & Safety Code Ann. § 573.001). The Court, therefore, finds Officer Sanchez's actions were justified by the community caretaking exception to the warrant requirement and, as a result, Smith failed to meet his burden as to the first prong of the qualified immunity analysis because Officer Sanchez did not violate Smith's constitutional rights. *Freeman v. Gore*, 483 F.3d at 410.

The Court need not reach the second prong of the qualified immunity analysis because Smith failed to meet his burden on the first prong. However, in the interest of being thorough, the

Court will also address whether Smith has met his burden to point out clearly established law showing Officer Sanchez's actions were objectively unreasonable at the time of the alleged constitutional violation. *See Freeman v. Gore*, 483 F.3d at 411. As with the first prong, the Court finds Smith fails to meet his burden on the second prong. Well-established Fifth Circuit caselaw provides that the community caretaking exception applies where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm. *Cantrell v. City of Murphy*, 666 F.3d at 923. Such is the case here, where Officer Sanchez was reasonable in believing Smith was mentally ill and posed a risk of harm to himself or others based on Smith's unusual, hostile, and erratic behavior. The Court, therefore, finds Smith has failed to meet his burden on both prongs of the qualified immunity analysis and Officer Sanchez is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons discussed, the Court finds, after viewing the facts in light of the available video evidence, no material fact dispute remains and judgment in favor of Officer Sanchez is appropriate as a matter of law. The Court, therefore, **GRANTS** Officer Sanchez's Motion for Summary Judgment and **DISMISSES** this case. *See* ECF No. 23. Final judgment will be entered by separate order.

It is so ORDERED.
SIGNED this 16th day of August, 2024.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE